# Gardner et al. v. Lincoln Bank & Trust Co.

(Decided Nov. 3, 1933.)

DAYTON MITCHELL and BENJ. F. GARDNER for appellants.

J. H. GOLD for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

In the trial court Nellie T. Gardner moved to set aside a judgment and the sale made thereunder, and her motion was overruled. The Lincoln Bank & Trust Company (hereafter called the bank) sought and was awarded against Mrs. Gardner and her husband, Benj. F. Gardner, a writ of possession of the property sold under that judgment, and both Mr. and Mrs. Gardner have appealed.

On August 31, 1927, C. W. Brickley and his wife executed to the bank a mortgage on this property to secure the payment of six bonds of $1,000 each, all due one year thereafter.

February 29, 1928, Brickley and wife conveyed this

property to Gardner and wife by deed of record, Deed Book 1328, p. 216, and the grantees assumed and agreed to pay these bonds.

This deed conveyed this property to Mr. and Mrs. Gardner as tenants in common during their joint lives with remainder in fee to the survivor. November 4, 1929, the bank sued Brickley and the Gardners upon these bonds and the mortgage, alleging that interest was due on these bonds from February 28, 1929, and sought a sale of the property to pay the bonds and $131.29 the bank had paid for insurance on the property. Process issued directed to the sheriff, and upon it this appears:

"I hereby appoint W. A. Halliday a special bailiff to execute the within Writ. Aubrey Cossar, S. J. C., By Albert Tyler, D. S.

"Executed Nov. 5, 1929, on Benjamin F. Gardner, and C. W. Brickley; Nov. 6, 1929, on Nellie T. Gardner by delivering to each of them a copy of the within summons. Aubrey Cossar, S. J. C., by W. A. Halliday, S. B.

"Affiant, W. A. Halliday, states that he is a male white person over the age of 16 years, not interested in this action nor related to any of the parties hereto and that the return hereon is true. W. A. Halliday.

"Subscribed and sworn to before me by W. A. Halliday this 6th day of November, 1929. A. E. Hollenkamp, Notary Public, Jefferson County, Kentucky. My commission expires Jan. 30, 1930 "

Benj. F. Gardner's demurrer to the petition was overruled. He filed an answer making an issue as to the money alleged to have been paid for insurance. The court found against him. On March 20, 1930, the court entered a judgment against all three of the defendants for this $6,000 with interest from February 28, 1929, and $131.39 with interest from October 8, 1929, and ordered the property sold in satisfaction thereof.

On March 17, 1930, the bank in open court acknowledge payment on its judgment by Benj. F. Gardner of $1,200. On October 23, 1930, the bank acknowledged a further payment by Benj. F. Gardner of $200 on its judgment. On March 14, 1931, the commissioner reported that on March 9, 1931, he had sold the property,

to Benj. F. Gardner for $5,570; and the commissioner paid into court $250 which Gardner had deposited when his bid was accepted. On March 21, 1931, Benj. F. Gardner filed exceptions to the report of sale because:

"The defendant, Nellie T. Gardner, was never served with summons and the judgment and sale as to her is invalid."

On March 6, 1931, he filed in support of his exceptions her affidavit, which, omitting the caption and jurat, is:

"Nellie T. Gardner, says she is the wife of Benj. F. Gardner and part owner of the property sued herein. Affiant says that never at any time was a summons served on her by the Sheriff, Special Bailiff or any person. That she knew nothing of said cause prior to advertising the property for sale at which B. F. Gardner became the highest bidder therefor. She says the foregoing statements are true. Nellie T. Gardner."

On April 16, 1931, Benj. F. Gardner withdrew his exceptions and was allowed two weeks to comply with the terms of sale. He failed to comply, and on June 11, 1931, the property was ordered resold.

On August 17, 1931, the commissioner reported he had offered the property for sale and the bank had bid it in for $5,000. On October 3, 1931, sale to the bank was confirmed, and on October 13, 1931, a deed for it was delivered to the bank. On October 24, 1931, the bank entered a motion against Benj. F. Gardner and Nellie T. Gardner for a writ of possession. On October 29, 1931, Nellie T. Gardner moved the court to set aside the judgment, the sale made thereunder, and to cancel the deed made for want of process on her and in support thereof filed her affidavit, which, while more elaborate, is essentially the same as the one copied above, except in this one she alleges the return is a mistake on the part of Halliday.

On November 7, 1931, the evidence was heard before the court, it was taken down by the stenographer, it and the exceptions thereto have been made a part of this record, and will be discussed presently.

On February 23, 1932, the court overruled Mrs. Gardner's motion to set aside the judgment, etc., and ordered a writ of possession to issue against Mr. and

Mrs. Gardner. The Gardners excepted, were granted an appeal, they have superseded the judgment, and here they are.

Our first question is: Can Mrs. Gardner impeach this return after judgment has been entered against her? The courts are not agreed that the return, even if it recites personal service, is impervious to attack in a direct proceeding by the party upon whom the service purports to have been made, provided no rights of third persons have intervened. There is good authority upon the proposition that sheriff's return of service of summons is not conclusive between the parties in the same proceeding after judgment is rendered, but that defendant on motion to set the judgment aside can prove the falsity of the return. A thoroughly considered case, which upholds the right of a defendant to vacate by motion a judgment which had been rendered against him without notice of the suit, is found in Du Bois v. Clark, 12 Colo. App. 220, 55 P. 750, 751. In that case the action was against two defendants. The return of the sheriff recited personal service of summons on both. An appearance was made by attorney for both defendants, and an answer filed. The trial resulted in a judgment for the plaintiff, from which an appeal was taken, and the judgment reversed and the cause remanded for a new trial. See Tabor v. Clark, 15 Colo. 434, 25 P. 181. On the second trial judgment was again rendered against both defendants, the record showing the appearance of both defendants by the same attorney as before. Six months afterward one of the defendants moved the court to vacate the judgment, as against him, and to recall the execution which had been issued, on the grounds that no summons was served upon him in the action, and that he had no knowledge or notice of the action, and that he had never appeared or authorized any appearance in his behalf in the suit, and that the return of service of summons upon him and the appearance of attorneys for him in the action were unknown to him until after execution had been issued. The motion was denied by the trial judge, but his ruling was reversed on appeal. In reversing that judgment the court said some things we think quite applicable here, so we shall quote some of them:

"If the officer does not personally know the defendant, he must make inquiry, and must de-

pend upon the result of the inquiry. He may be directed to the wrong man, or he may misunderstand the direction, and make service upon the wrong man. In finding the man, he is acting upon information received from others. As it is entirely possible that the identity of the party may not be within the officer's knowledge, why should it be conclusively presumed that it is? As it is entirely possible that he may, by misdirection or mistake, serve the process on the wrong man, why should it be conclusively presumed that he served it on the right one? Instances of mistakes by officers in the identity of persons sought are to be found in the books. * * *

"In respect to process, the constitution places life, liberty, and property upon an equality, a party cannot be deprived of his property without service of process in the manner provided by law. A presumption of service may or may not be true; and, if it is false, a judgment entered upon it, if it is enforced by execution, results in depriving the person, who is the subject of the presumption, of his property without due process of law.

"The authority of a court to set aside its judgment, when the action is demanded by justice, is not dependent upon statute. The power is inherent, and may, in a proper case, and upon a proper showing, be exercised at any time. See Ladd v. Stevenson, 112 N. Y. 325, 19 N. E. 842 [8 Am. St. Rep. 748]."

See Morris v. Morris 225 Ky. 823, 10 S. W. (2d) 277, South Mountain Coal Co. v. Rowland, 204 Ky. 820, 265 S. W. 320, and Holcomb v. Creech, 247 Ky. 199, 56 S. W. (2d) 998.

This evidence shows that Mr. Halliday came to the office of Mr. Benj. F. Gardner, and this is taken from Mr. Gardner's testimony:

"Mr. Halliday brought the summons in and served it on me and had a copy for my wife. He didn't know where she was. He asked me where she could be found. I told him she was out home, I was satisfied, told him where I lived. He seemed to have a little trouble in getting the location fixed in his mind. I don't know whether he objected to going out or what, but he said, 'Why can't I hand

this to you? Why can't I give this summons for her to you?' I said, 'You can do as you like about it.' I knew it wasn't a good summons, but I expected to take care of the matter, I had a sale of another piece of property on and expected to take care of it, thought that would be the end of it, and he left that summons with me. * * * I think that all occurred on the same day, or he might have come back the second day and brought that summons to get further information about where she was or where we lived. * * * I am positive he left that summons with me and asked me if I wouldn't give it to her. * * * He came back there and talked to me about it, as is evidenced by that acceptance and its rejection, which is probably true, he came back the next day and talked to me about it, but he did not take that summons away, that copy for her. * * * It was left there with me. I don't know that I filed it away, but it would be an easy matter even if served on her for me to get it and have it, you understand, but he left the copy there. I might find it in the files. I will make a most exhaustive search for it.''

The substance of Mrs. Nellie T. Gardner's testimony is that she does not know Mr. Halliday, that she does not remember ever seeing him before (referring to the time she was testifying), that she knows he was not out home (referring to the property in question on Seminole avenue), that she never saw him out there, that he never served a paper on her in this case, that she then had a young baby and was always at home the most of the time, that Mr. Gardner said nothing to her about the suit, and she knew nothing of it until the appraiser came out to appraise the property and tacked a notice on the house. (This was probably October 14, 1930.)

The substance of Mr. Halliday's testimony is: I served the paper on Mr. Gardner in his office. He accepted service for his wife. He said he was playing for time and his wife wasn't feeling very well and he didn't care for me to go out there on that day. Now to the best of my recollection this summons tells it all. It has been two or three years ago. I serve 75 or 80 summons a week, 50 or 40 along there, and I have been doing it right along for 30 years. There is no incident

or fact in connection with the service of this summons that impressed it on my mind, just my return is what I am depending on, plus a recollection that Mr. Gardner stated that he didn't want his wife bothered because she wasn't feeling well. My return does not show where I served Mrs. Gardner, but I believe it was on Seminole avenue. I have seen Mrs. Gardner lots of times in Mr. Gardner's office, and I think I knew her by sight in November, 1929, but I have never met her personally. I do not remember going to Mr. Gold's office after serving Mr. Gardner. Mr. Gold sent me back the next day. I'll tell you, he first accepted it and we scratched it off, don't you understand, the next day. That's when I went to serve her. He wouldn't accept Mr. Gardner's acceptance of the paper. When I showed him the return that he had accepted it, and then they wouldn't accept it, and went back, the next day, I reckon it was, I went back to Mr. Gardner's office. It made him mad because they wouldn't accept the summons; he said that was all right. They told me to go and serve her.

On cross-examination, he admitted he could not recollect whether the house was brick or frame, could not recall whether he served Mrs. Gardner in the front hall, in the kitchen, in the back yard, or on the front porch, whether it was late in the evening or early in the morning, whether he went out there on the street car or in an automobile, or whether she said anything or not when he served the process.

The substance of Mr. Gold's testimony is: I prepared the pleadings in this case and conducted it all along for the bank. Mr. Halliday serves all our papers, and he came in and said: "I have served Mr. Benjamin F. Gardner in this case and he has accepted service for his wife." I said: "You ought to know better than that. That's not worth the paper it is written on. You go back and get that copy of that summons that you delivered to Mr. Gardner for his wife and take it out to her home and serve it on her." I remember that very distinctly because it was an unusual circumstance. I have been practicing law since 1922, and this never occurred to me before.

Competency of Mr. Gardner's Testimony.

The bank filed exceptions to the testimony of Benj. F. Gardner, who is, so it alleges, not a competent wit-

ness for his wife; but both Mr. and Mrs. Gardner are resisting the bank's motion for a writ of possession, they are both defendants as to it, both will be affected by the court's judgment, and each has a right to testify, although Mrs. Gardner may derive some benefit from her husband's testimony.

### Attack on the Judgment.

The bank insists the Gardners by this defense are making a collateral attack on this judgment and that it cannot be so attacked. The bank is mistaken, this is a direct attack on this judgment, it is a motion to set it aside upon the ground that it is void as to Mrs. Gardner for want of process on her, and a void judgment is not worth the paper it is written on and can be attacked anywhere, any time. Now we come to the principal question in this case.

### Service by a Special Bailiff.

This summons purports to have been served by a special bailiff. Such service is authorized by section 47 of the Civil Code of Practice. Such a service is by section 4562, Ky. Stats., declared to have the same validity and effect in law as if made by the sheriff. Section 4563, Ky. Stats., makes the sheriff responsible for the acts of the special bailiff and declares the special bailiff shall be liable to prosecution for false swearing if he wilfully verify a false indorsement by his affidavit. Section 47 of the present Civil Code of Practice was section 73 of the Code of 1854 and section 100 of the Code of 1851. Sections 4562 and 4563 were sections 7 and 8 of chapter 100 of Gen. Stats. 1873, and sections 7 and 8, ch. 91 of Rev. Stats. 1852; yet this court with those statutes before it has at least intimated in the following cases that the presumption in favor of a sheriff's return does not arise when the return is made by a special bailiff: Lloyd's Adm'r v. McCauley's Adm'r, 53 Ky. (14 B. Mon.) 430; Webber v. Webber, 58 Ky. (1 Metc.) 18; Barbour v. Newkirk, 83 Ky. 529; and Simms v. Simms, 88 Ky. 642, 11 S. W. 665, 11 Ky. Law Rep. 131.

By section 4574, Ky. Stats., which was section 20 of chapter 100 of Gen. Stats. 1873, and section 20 of chapter 91 of Rev. Stats. 1852, it is provided that any sheriff, who shall knowingly make a false or illegal return of any process or fee bill by color of his office, shall

be liable to the person injured thereby, for treble the damage that shall be assessed therefor. Whether this section 4574, Ky. Stats., is the cause of the court intimating what it did in the cases cited, whether sections 4562 and 4563 were entirely overlooked, or whether the court may have concluded that while the manner of service is purely statutory the sufficiency of the evidence thereof is a judicial question for the courts to determine and not the Legislature, we cannot say, but such seems to be the position of courts in other jurisdictions. 50 C. J. p. 581, sec. 307.

## The Return on the Process.

The bank relies upon section 3760, Ky. Stats., which it contends makes this return unassailable except in a direct proceeding against the officer, but it overlooks the concluding part of that section, which leaves this return open to attack for mistake on the part of the officer, and in her second affidavit Mrs. Gardner alleges this return was a mistake on the part of Halliday. Thus she brings her case squarely within the application of Bramlett v. McVey, 91 Ky. 151, 15 S. W. 49, 12 Ky. Law Rep. 760, which is conclusively favorable to her.

## Did Halliday make a Mistake?

This is the most important question, and one not easy of solution. To start with, we have the return, verified by oath, *made at the time*, by a special bailiff, with no interest in the case, and no motive for making a return contrary to the fact, against which we have the evidence of interested parties testifying two years after the service is claimed to have been made. There are cases that look as though the return should be sustained. Sullivan v. Niehoff, 27 Ill. App. 421; Allen v. Hickey, 53 Ill. App. 437; Lancaster v. Snow, 184 Ill. 534, 56 N. E. 813; Tatum v. Curtis, 68 Tenn. (9 Baxt.) 360. Galvin v. Dailey, 109 Iowa, 332, 80 N. W. 420.

But the doctrine that an official return cannot be impeached by the uncorrborated testimony of the party appearing to have been served is repudiated in the case of Trager v. Webster, 174 Mass. 580, 55 N. E. 318.

In Davant v. Carlton, 53 Ga. 491, the court speaks of the evidence against the return as ''negative'' evidence. We cannot agree to that. Not every statement that a state of fact does not exist, or an event did not

occur, is to be classed as negative evidence in the sense that it is entitled to less weight than positive evidence the facts do exist or the event did occur. What is meant by positive evidence is testimony that intrinsically shows the witness had opportunity to observe and did observe, and negative evidence is testimony that does not of itself show that. When a witness testifies the clock struck the hour, that includes the idea that the witness was listening and heard it, whereas the unexplained testimony of a witness that the clock did not strike may mean simply that the witness did not hear it. In Louisville Chemical Works v. Com., 71 Ky. (8 Bush) 179, there was a question whether certain heaps of bones stank. Some witnesses said, "Yes"; others with equal opportunity to observe, said "No." The court gave this instruction:

"Where there is a conflict in the testimony of witnesses, the one side being of an affirmative and the other of a negative character, the affirmative character of testimony is preferred, and is entitled to the greater weight by the jury in making up their verdict."

Because of the giving of this instruction this court reversed the judgment, giving the old illustration about whether the clock did strike or not, showing it did not apply and concluding by saying: "The proof was as positive and direct upon the one side as the other."

We believe that is applicable here, and the testimony of Mrs. Gardner is entitled to just as much probative weight, as the testimony of Mr. Halliday. To her, this service meant the probable loss of her home, and it, if made, would have burned itself into her memory so deep she could not have forgotten it, while to Mr. Halliday it was only a casual event in the day's work. With these observations we will now consider the evidence.

To start with we have the irregular service which Halliday attempted to make on Mrs. Gardner by delivering a copy to her husband for her. We have the testimony of the attorney for the bank that he rebuked Halliday for that and sent him back to serve Mrs. Gardner; we have Mrs. Gardner's unequivocal statement the process was not served on her; we have evidence that she brought this to the attention of the bank not only

on October 29, 1931, when she made her motion to set aside this judgment and sale made thereunder, but had done so upon the 26th of March before, when she made her affidavit in support of her husband's exception to the report of sale. Against this we have the testimony of Halliday, whose memory should have been impressed by the rebuke given him by Mr. Gold, and yet he has now no independent recollection about the matter, he does not even remember Gold's rebuke, and he can only say he served Mrs. Gardner because his affidavit says that he did. A return of service ought not to be lightly disregarded; but when we have unequivocal testimony that service was not made, and we have no better testimony than this that it was, coupled with an irregular service at the outset, there is nothing for the court to do but to hold there was no service on Mrs. Gardner. The court will deny the motion for writ of possession, will set aside its judgment and the sale made thereunder, award the bank alias process for Mrs. Gardner, and let the cause proceed.

Judgment reversed.